**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **3:20-CR-00014 (KAD)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **THOMAS F. LANGAN** | **:** | **September 14, 2022** |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING** [1]

**I.  Introduction**

In sum, this case initially presents as a simple antitrust case. However, the case is complicated by several factors: the workings of the construction industry, the roles played by other similarly charged defendants and the true nature of the collusion.  The complexity is evident by nine (9) continuances necessary to ascertain purported damages reflecting the Government's modified understanding of the collusive conduct. The collusion was primarily designed to position a bidder to get a contract, not inflate pricing. Mr. Langan has been instrumental in educating the Government about the industry practices despite his lesser and often insignificant role. It is telling that, in accordance with Mr. Langan's persistent representations, the Government recently acknowledged that the victims and damages in the collusion, were not as originally charged. In light of his participation and cooperation with the

---

[1] This Memorandum is being filed simultaneously in <u>U.S. v. Thomas Langan</u>, Dock 3:20-CR-00014 (KAD) and <u>U.S. v. Langan Insulation, LLC.</u>, Dock 3:20-CR-00015 (KAD) and with the consent and knowledge of both defendants, due to the commonality of facts.

1

Government, his age, limited participation and anticipated payment of full restitution, a period of probation is requested or home confinement.

**II. <u>Damages and the Insulation Industry Involvement</u>**

The corporate and individual defendants colluded with each other to assure that a specific insulator (among the colluders) would be chosen to compete against the other insulators—that were not part of the conspiracy—bidding on specific construction projects. While the effect of their conduct misled the mechanical subcontractors (the mechanicals), their action had no substantial effect on the costs incurred by the mechanicals on any specific project. Accordingly, for sentencing purposes it would be incorrect to gauge the offense conduct through loss calculations as structured under the sentencing guidelines.

This requires an explanation.

The major ingredient to guideline applications in financial fraud cases is loss calculations. The loss-driven guidelines have been criticized as excessively punitive and failing to adequately consider significant factors that bear on actual culpability. The defendants in this case have not been convicted of fraud but rather antitrust violations; nevertheless, the loss-driven guidelines apply.

In 2014 the American Bar Association Task Force proposed revision of Section §2B1.1 which would have taken the focus off the loss computation and instead differentiated among

various types of fraudulent conduct. That proposal was rejected by the Sentencing Commission. The Second Circuit however has invited sentencing courts to impose non-guideline sentences based on a policy disagreement with the guideline whenever the loss computation calculation has a significant role on the guideline range.

The guideline policy disagreement, as articulated by the Second Circuit, has to do with the Commission's approach by allowing the sentence to be "loss driven" as opposed to "offense driven". As stated by the Second Circuit:

> Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-guideline sentence. *United States v. Algahaim*, 842 F.3d 796, 800 (2nd Cir. 2016).

There is no dispute there was collusion between, and among the individual and corporate defendants in this case and that the bids submitted to secure insulation work reflected that collusion. As typical of many conspiracies, although the ultimate goal can be identified and dollar amounts projected, the role of each defendant and whether the arithmetic projections of theoretical loss/gain can be properly attributable to each defendant is a variable. In order to properly gauge those issues in this case as to each insulator for sentencing purposes, an understanding of the realities of the construction bidding process, the respective parties and their interrelationships, the manner and practices of bidding, and where the insulators fit in the

process is necessary.

- **<u>Construction Bidding</u>**

    In its simplest terms, construction projects begin with the developer/owner.  In the most common process, the developer/owner hires a general contractor.  The general contractor solicits prices from, and then hires, subcontractors.  One of those subcontractors is the mechanical subcontractor (the mechanical).  The mechanical subcontractor hires contractors – essentially sub-subcontractors – from the various trades, i.e., fire prevention, sheet metal work, pipe insulation, controls and some others.  The insulators are one of those sub-subcontractors.

    The hiring is done based on a bidding process.  The developer/owner hires an architect who develops plans and specifications for a specific project.  It solicits bids from general contractors who then solicit bids from subcontractors to perform the work necessary to construct the project according to the plans and specifications. Each subcontractor will solicit bids from its normal sub-subcontractors and suppliers.   The various trade contractors provide their respective bids to the general contractor who aggregates the bids and makes a proposal to the developer/owner. As part of the aggregation process, the general contractor checks the scope of work on which each trade bids and then selects for any one trade a subcontractor and corresponding bid to include it its overall bid to the developer/owner. In the invitation to bidders that solicits bids, the developer / owner will normally describe the basis on which it

will select a general contractor. After all the bids are received and the "successful" bidder is determined normally, the general contractor enters into a contract with the developer/owner and then the general enters into subcontracts with the various subcontractors.

But everything is <u>not</u> <u>over</u> as far as the insulators go.

- **<u>The Customs and Practices for Insulator Bidding</u>**

Simply stated, the insulators are at the bottom of the pecking order of the various trades. As indicated in the Presentence Investigation Report, and generally understood, insulation contracts are typically 1% of the overall contract amount. (See USDC DOC 19, paragraph 11 of PSR, dated April 15, 2020.). The insulators do insulation work on heating ventilation, and air conditioning. The cost of their supplies is known by the mechanicals because the supply houses normally bid to the mechanical contractors as well. The costs of insulators labor, especially in Government jobs, is reasonably predictable by the mechanicals.

The end result of those ingredients is that the insulators bidding is done in two stages. Both the insulators and the mechanicals know this reality. In stage one the first bid submitted by insulators is known as a "soft" bid. It is accepted by the mechanicals initially and becomes part of the bid the mechanical submits to the general. Once the developer accepts the winning general (who has already accepted the mechanicals' bid, stage two takes place). The mechanical essentially squeezes the winning insulator – a process known as bid shopping. The

implicit threat, of course, is that the mechanical knowing the range of bids from the bid phase can coerce a lower number from the bidders because the winning insulator knows it can be replaced by a competitor.

The mechanical may have a reasonable estimate of the costs of the insulators job, the goods and labor that from beginning, before the first bids are submitted. It also knows the acceptable profit margin for the insulators. And, importantly, it knows that there will be "flex" below the number of the insulators first bid. It knows all that before the initial bid is submitted by the insulators, and also knows that from the time the initial bid is received and accepted. In short, the mechanical knows that it can squeeze the insulators for a lower number. Importantly, the insulators know, allow for that in their pricing model and participate in the exercise as well.

- **<u>The Deception</u>**

The deception in this case is that the mechanicals did not know that the insulators cooperated and colluded with each other to protect themselves by steering the selection by the mechanical of the bid to one of the colluders. This was accomplished through an agreement among the colluders as to who would be the low bidder on a particular job. To assure that insulator would be selected, they agreed either not to submit any bid on a particular job or, alternatively, to submit an artificially higher bid to allow a low bid winner. The collusion protects all from the inevitable stage two unilateral and capricious squeeze

The insulators knew each other; some, in fact, had over their careers worked with each other. They communicated among themselves to assure jobs were distributed appropriately. This was not always a happy family. There were disagreements. Sometimes they were all not "in sync" on all jobs. In addition, relationships with the mechanicals was often an intangible.

The gist of the crime – rather than causing the mechanicals to pay out more than the job was worth and to reduce profits – was collusion to influence who among the colluders, got the job, if, in fact, a colluder was to be chosen after stage two. It was possible that one of the colluders did not ultimately win the job because an insulator outside the conspiracy was the low bidder as a result of competition.

The collusion engaged in by the insulators was a defensive tactic to limit the bargaining power of the mechanicals who themselves disregarded the initial bidding process and shopped the bids after the first round of bidding.

By joining together, the insulators protected each other.

### III.    As To the Defendant Langan Insulation, LLC.

Defendant, Langan, Insulation LLC has entered a plea pursuant to Federal Rules of Criminal Procedure 11(c)(1)(B).

As set forth in Paragraph 8 of the Pre-Sentence Report for Langan Insulation LLC, the

plea was entered pursuant to Federal Rules of Criminal Procedure 11(c)(1)(B) pursuant to which the Court must advise the corporation that it has no right to withdraw the plea unless the Court does not follow the recommendation or request of the parties. Both the Government and the defendant agree that a criminal fine of $150,000.00 is appropriate in this case. The Government and the defendant agree that the applicable fine range exceeds the recommended fine due to the inability of the defendant to pay a fine greater than an amount that includes this recommended reduction and make restitution without substantially jeopardizing the Corporation's continued viability.

The defendant, pursuant to the agreement, agrees to forfeit in the parallel civil forfeiture case its interests in the contents of a specified account held in the name of Langan Insulation, LLC. The defendant has executed a stipulated forfeiture agreement to that effect. The parties have agreed that the sentence shall not exceed five years' probation, a $150,000.00 fine, an $800.00 special assessment and a $3,200,000.00 order of restitution and forfeiture of assets of the identified account. A subsequent Plea Agreement Supplement to the Plea reduced the fraud loss to $1,471,790 and restitution by Thomas Langan and Langan Insulation LLC jointly and severally in the amount of $480,900.

In sum, then, the defendant requests the imposition of a sentence agreed upon by the parties; a fine of $150,000.00; and forfeiture of the contents of account ending in 5419 held in

the name of Langan Insulation, LLC at Key Bank; an order of restitution, jointly and severally with the other defendants in the amount of $3,200,000.00 and a five-year probationary period. A subsequent Plea Agreement Supplement to the Plea, reduced the fraud loss to $1,471,790 and restitution by Thomas Langan and Langan Insulation LLC jointly and severally in the amount of $480,900.

The fine has been paid pursuant to an agreement between the parties. One Hundred Thousand Dollars has been sent to the Clerk of the Court pursuant to the plea agreement; and the contents of the Key Bank account referred to in Paragraph 9 Defendant's Pre-Sentence Report to be applied to the fine. In addition, it should be noted that restitution order, when reiterated in orders to the other defendants in this conspiracy, applies jointly and severally and is anticipated to be paid in full in a timely manner from funds seized and held by the United States as part of this entire prosecution.

In sum, then, the defendant requests that the imposition of a sentence agreed upon by the parties. Defendant Langan Insulation, LLC request is for a sentence of a criminal monetary imposition/fine of $150,000.00 ($100,000 being held with the Clerk of the Court); and forfeiture of the contents of account ending in 5419 held in the name of Langan Insulation, LLC at Key Bank (totaling $49,911.50 to be applied to anticipated criminal monetary penalties by agreement with the Government), an order of restitution, jointly and severally with the

Langan defendants in the amount of $480,900 (pursuant to the supplemental plea agreement) and a five-year probationary period.[2]

**IV. <u>Thomas Langan Plea</u>**

On February 3, 2020, Thomas Langan appeared in the United States District Court at Bridgeport, Connecticut, before the Honorable Kari A. Dooley. On that date, Mr. Langan waived indictment, and entered a guilty plea to a two-count Information which charges Conspiracy to Restrain Trade, in violation of 15 USC § 1, and Conspiracy to Commit Wire Fraud, in violation of 18 USC § 1349. In the plea agreement in this case the Government calculates a total offense level of 22, and the guideline imprisonment range is 41 to 51 months. Mr. Langan calculates a total offense level of 16, with a guideline imprisonment range of 21 to 27 months. The difference in the Government and Defendant's number were due to the actual loss involved. Mr. Langan maintained consistently that the Government miscalculated the damages resulting from his involvement. Prior to recent Plea Agreement Supplemental Stipulation (doc. # 84 as to Mr. Langan), the PSR calculated an offense level of 20 with an imprisonment range of 33 to 41 months.

By agreement with the Government, Mr. Thomas Langan and per the February 3, 2020, plea letter (USDC – Thomas Langan - doc # 5, p.3), Mr. Langan paid $10,000 to the Clerk of

---

[2] The Special assessment, as well as any minor deficiency resulting from the payment held by the United States District Clerk of the Court (i.e. $88.50) shall be paid following the sentencing.

the Court in anticipation of criminal monetary imposition. Similarly, Langan Insulation, LLC paid to the Clerk, $100,000 (USDC –Langan Insulation, LLC - doc # 4, p.3).

The facts of this case show that the loss amount Mr. Langan was involved in is less than the amounts originally advanced by the Government, restitution paid in full, Mr. Langan's law abiding life, unsophisticated participation should be considered in factoring a just disposition. Additionally, a downward departure or a non-guideline variance when imposing sentence, should factor Mr. Langan's persistent participation with the Government investigation and prosecution, accept of responsibility of Langan Insulation, LLC's plea in 2020 at Mr. Langan's direction (first amongst the co-defendants companies), his military service, dedication to his family, the likely impact on his business and employees, his life of compliance and the harsh and unusual impact of incarceration may have on a man of his age and condition. These factors are set forth in mor detail below.

### V. <u>Relevant Chronology</u>

As noted in the PSR, Mr. Langan is a 73-year-old man who has worked his whole life to support his children and family. He served his country as an Aero Medic on C-130s, to which he attributes his hearing loss. Following his military service and honorable discharge, Mr. Langan joined the labor force where he remains today. In March 2009, Mr. Langan founded

Langan Insulation, LLC. It is a family run and operated small business, that today employs 16 full-time workers and 3 staff employees, including various family members. He presently owns 49% of Langan Insulation, LLC together with his niece Kristin Langan, who owns 51%. The company offers commercial insulation services, predominantly through union employees. The operation was small, but nimble with less overhead. In comparison to many of his competitors, Langan Insulation was unable to compete in larger commercial construction opportunities, which was known to mechanical and general contractors. Mr. Langan's admitted role in the conspiracy, was exclusive on behalf of Langan Insulation, LLC, as no other employees were privy to final bidding.

As noted above, the commercial insulation business is an industry controlled and manipulated by mechanical contractors. Mr. Langan was approached and unfortunately convinced by the co-conspirators to participate in a plan resulting in a violation of the law. He participated essentially in two different ways: (1.) Mr. Langan shared bid numbers with his conspiring competitors during the bidding and contract process; and (2.) On jobs that Mr. Langan was not interested, or unable to perform due to the size of the required work, he submitted inflated bids with the knowledge his co-conspirators. The original intent was to allow the lowly commercial insulators an opportunity to try and level the playing field in which mechanical contractors bid the insulators against each other. The outcome was collusion.

Mr. Langan regrets his involvement in and acknowledges responsibility for his actions. It is his firm position that in the contracts awarded to Langan Insulation, LLC, his final bid package, represented a fair market commercially reasonable quote (in at least one such bid he lost money and in another he is involved in litigation to collect approximately $300,000 outstanding). At the time of plea, Mr. Langan was informed that the Government had irrefutable evidence of illegal mark ups of 10% on bids. Mr. Langan contested this conclusion as the contracts awarded were within reasonable and known industry standards. Moreover, his numbers were not inflated. Subsequently, the Government acknowledged that the 10% was inaccurate and the mechanical contractors were in fact not the "victims' to the collusion. The amended stipulation regarding the now 5% loss, still is questioned by Mr. Langan as "approximately," as he is only able to attest to his own accepted bids. Moreover, it is hard to believe that the mechanical and/or general contractors would permit excessive bids as the industry had a general comprehension of insulation costs based on the size and scope of each project. Also, some contract bids had independent insulators bidding who were not part of the colluding defendants. The outside bids were never known in advance. Query, how third-party competitors, whose independent bids were not selected, refutes the idea of collusion as to pricing.

## VI. Mr. Langan's Participation and Conduct was not Sophisticated as Anticipated from the Government.

Mr. Langan became involved in this unfortunate conspiracy in a limited way. He was approached by his friend, Gary DeVoe, whom he worked with years prior with a different employer, to join an ongoing group of insulators. DeVoe coordinated exchange of information on all the bids involved. He suggested an app called Confide to coordinate information. Mr. Langan, due to a lack of sophistication, was unable to use the app. as he did not understand the technology. A simple use of the phone was suggested. It's unknown if the other conspirators used the technology. It is acknowledged, however, that during his involvement, Mr. Langan used his cell phone to discuss bid numbers and exchange information. At most times, Mr. Langan was unsure which companies were involved in the bid exchanges. He had no supervisory role or involved to any sophisticated level.[3]

---

[3] Although, in dicta, an older case involving the interpretation of "sophisticated means" found it to be offense related, not individual. See *United States v. Lewis*, 93 F.3d 1075, 1084 (2d Cir. 1996). The version of the guidelines in place for tax evasion offenses used a passive voice, stating as quoted in the *Lewis* case, "if sophisticated means were used to impede discovery . . . of the offense…" *Lewis* contrasted that to a portion of the guidelines that used an active voice and said the use of active voice meant it was defendant related. *Id.* The present version of the guidelines applicable to this defendant uses an active voice, stating if, "the offense otherwise involved sophisticated means ___and the defendant intentionally engaged in or caused the conduct constituting sophisticated means…___" (emphasis supplied) U.S.S.G. § 2B1.1(b)(10)(C). As such, it should be taken as an individual factor for a particular defendant. The emphasized portion of the guideline above was added in 2015, and even without analysis under *Lewis*, the

The conspiracy was haphazard and disorganized, at best. Some bids, despite the collusion, ended up with the non-designated defendant, due mostly to renegotiation by the mechanical contractor.

## VII. Sentencing Framework: Factors to be Considered in Imposing a "Reasonable" and "Individualized" Sentence Pursuant to 18 U.S.C. § 3553(A)

In Mr. Langan's case, a sentence below the advisory Guidelines range will comply with the Second Circuit's recognition of the need to avoid unwarranted sentencing disparities while imposing "individualized justice," *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005), abrogated on other grounds, *United States v. Fagans*, 406 F.3d 138, 142 (2d Cir. 2005), through a sentence that is sufficient, but not greater than necessary to comply with the purposes of sentencing.

---

use of the word "and" adds a personal involvement that did not exist in the guidelines when *Lewis* was decided.

Even before the guidelines were amended, the Second Circuit questioned the *Lewis* holding when applied to factual scenarios that did not involve tax fraud. "We wonder whether our Circuit would adhere to the full breadth of the proposition asserted in Lewis, especially as applied to a different Guideline unrelated to the collection of taxes, if in fact confronted with a minor participant who had neither awareness nor notice of the use of sophisticated means by others in committing the offense." *United States v. Amico*, 416 F.3d 163, 169 (2d Cir. 2005). In that case the issue was undecided as the facts supported the enhancement to the defendant as an individual.

Other Circuits required personal involvement in the sophisticated means by the individual defendant even at about the time *Lewis* was decided. "...the sophisticated means enhancement requires the sentencing court to look at the actions taken by the individual." *United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996).

Sentencing courts are allowed "to consider the widest possible breadth of information about a defendant [to] 'ensure[ ] that the punishment will suit not merely the offense but the individual defendant.' " *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)).  The inquiry is "largely unlimited ... as to the kind of information ... consider[ed], or the source from which it may come." *United States v. Broxmeyer*, 708 F.3d 132, 135 (2d Cir. 2013).

Title 18, United States Code § 3553(a) provides the framework within which a sentencing judge must determine the appropriate sentence for a defendant:

> **<u>Factors to be considered in imposing sentence.</u>** The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider:
>
> > (1) the nature and circumstances of the offense and the history and characteristics of the defendant.
> >
> > (2) the need for the sentence imposed –
> >
> > > A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > >
> > > B. to afford adequate deterrence to criminal conduct;
> > >
> > > C. to protect the public from further crimes of the defendant; and
> > >
> > > D. to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

(3) the kinds of sentence available.

(4) the kinds of sentence and the sentencing range established for—

> A. the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines
> . . .

(5) any pertinent policy statement—

> A. issued by the Sentencing Commission . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

As the Court is aware since 2005 the mandatory nature of the Guidelines has been unconstitutional, and that the Guidelines' binding authority violated a defendant's Sixth Amendment right to trial by jury. See *United States v. Booker*, 543 U.S. 220 (2005). While a sentencing court is now still required to consider the Guideline range, it also must consider, equally, the other factors enumerated under § 3553(a) when imposing a sentence. This concept was upheld in *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), where the United States Supreme Court ruled that the District Court is held to no special standard when it departs from the advisory Guidelines, and that such sentences on

appeal, no matter how far above or below the Guidelines range, are only reviewed under the highly deferential abuse-of-discretion standard.

*Gall's* significant limitation on the reach of Appellate Courts to overturn the sentencing decisions of the district court in particular confirms that district courts are once again free to impose "individualized justice" as articulated by the Second Circuit. *United States v. Crosby*, supra, at 114. Thus, while a sentencing court must consider the applicable Guidelines range, there is no presumption that a sentence within that range satisfies all the objectives of § 3553(a). In fact, neither § 3553(a) nor the majority opinions in *Booker* or more recently in *Gall* and *Kimbrough* suggest that the sentencing court should give the Guidelines any priority over the other factors listed in § 3553(a).[4] To this end, the Second Circuit has stated that "[i]t is now … emphatically clear that the Guidelines are guidelines - that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). Indeed, giving the Guidelines any sort of presumptive correctness or weighted consideration would in effect resurrect them to the level of de facto mandatory, which obviously runs afoul of *Booker*. See

---

[4] It is noteworthy that the majority in *Gall* declined to adopt Justice Alito's suggestion, in dissent, that the Guidelines should hold "significant" weight to a judge's sentencing decision as compared to the other factors. See *Gall*, 552 U.S. at 5.

*United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) (citing *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006)) (declining to establish "any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable").

Guideline § 1B1.1 sets forth a three-step process for the sentencing court to follow in determining a "reasonable" sentence. The first step requires the sentencing court to determine the correct Guideline range for the case. In the second step, the sentencing court must determine whether a departure from the Guideline range is warranted due to the presence of extraordinary circumstances "of a kind" or "to a degree" that were not adequately considered by the Commission. These two steps will produce a sentence that is "under the framework set out in the Guidelines."

The third step requires the sentencing court to consider the factors under 18 U.S.C. § 3553(a) taken as a whole in determining an appropriate sentence. In this third step, the court must determine whether to impose a "variance" sentence, which is a sentence outside of the Guideline range (many courts have called this "a non-Guidelines sentence") by considering the factors set forth in Section 3553(a).

For the reasons articulated below, Mr. Langan respectfully requests that the Court depart from the advisory Guideline range or impose a non-Guidelines sentence (i.e., a "variance") of probation, which under these circumstances would fulfill Judge Newman's

recognition of imposing "individualized justice," *United States v. Crosby*, *supra*, at 114, as well the statutory mandate that "a sentence be sufficient, but not greater than necessary" to comply with the purposes of sentencing. 18 U.S.C. § 3553(a).

Factually, Mr. Langan is accused of communicating with other insulation contractors to rig bidding on a cell phone- a simple communication device owned by almost everyone over the age of 12.  It is important to note that phone calls were not infrequent between Mr. Langan and Mr. Devoe, unrelated to the conspiracy, as they both sat on a union pension board together during much of the time of the collusion.

**VIII.  The Facts of This Case Justify a Departure from the Sentencing Guidelines including a Non-Guideline Variance**

The facts concerning Mr. Langan warrant a variance departure from the recommended sentence regardless of the offense level found by the Court.

The Guidelines are systematically driven by many factors, including number of victims, size of alleged loss and sophistication of the conspiracy, *et seq*.  In the case at bar, Mr. Langan's offense level is significantly enhanced by the alleged total conspiracy loss calculations. His restitution requirement (which appears to be satisfied) differs from the enhancement of the conspiracy. This is precisely a scenario Judge Newman envisioned in *U.S. V. Algahaim,* supra, when considering a non-guideline sentence and variance.

> The problems with the loss enhancement have been evident since the inception of the Guidelines in 2004, then District Judge Gerard Lynch generously called the loss prevention eight "questionable" aspect of the guidelines United States versus imager, 320 9F sup, 2d 416, 427 (S. D. N. Y. 2004) he identified all of the problems with the scheme: the weakness of the correlation between the loss and moral seriousness: the rigidity of the loss amount overriding the diverse complexity of complex financial crimes, the lack of any consideration or danger to society and so on it at 427 – 28. The concerns have continued unabated. *United States v. Johnson* 16-CR-457-1 (NGG) (E.D.N.Y. Apr. 26, 2018)

It is appropriate for a court to rely upon Section 3553 factors where the loss enhancement leads to a sentence out of proportion to an appropriate sentence. United States v. Corsey, 723 F.3rd at 380-82 (op of Underhill, J. sitting by designation)

### 1) The Effect of Incarceration on Mr. Langan's Family Justifies a Variance

In the Second Circuit, the needs of family members are an established ground for departure. *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir.1992) ("Extraordinary family circumstances are widely accepted as a valid reason for departure."); *id.* (explaining that purpose of departure is to protect not the defendant, but his or her family members). The defendant's wife is 74 years old. As might be assumed, older members of our society rely on each other much more than a younger person, and Mr. Langan's family is no different. The Defendant provides daily support to his wife that extends well beyond financial.

Mr. Langan is a crucial member to the employees of Langan Insulation LLC. He remains a main estimator on projects which are bid for the future work and survival of his company. He is institutional knowledge of the requirements and necessities of performing projects is extremely

### 2) Mr. Langan's Age and Health Issues Justify a Variance Departure

Mr. Langan is 73. As indicated in the PSR, Mr. Langan suffers from high blood pressure, high cholesterol, elevated triglycerides, and takes blood thinners following a pulmonary embolism. In 2011, he underwent a double knee replacement. Policy Statement § 5H1.1 states in part:

> Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

Policy Statement § 5H1.4, provides in part:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward . . . .

Mr. Langan's medical condition combined with his advancing age mean that a limited sentence would fulfill all the purposes of sentencing.

### 3)  **Mr. Langan's Past Military Service Supports a Variance/Departure**

"Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."  18 USCS Appx § 5H1.11.  As documented in the PSR, Mr. Langan served in the U.S. Air Force Reserves starting in 1967, and was deployed to Germany, Italy and served in Chicopee, Mass at Westover Air Reserve Base.  In 1973, he was honorably discharged. Mr. Langan served his country during a period of armed conflict as an Aero Medic.  He was recognized by the Connecticut Lieutenant Governor with special recognition for his service. It

is appropriate for the Court to take his voluntary service into account when deciding what is appropriate for him as an individual.

4) **Incarceration is NOT Necessary to Afford Adequate Deterrence to Criminal Conduct**

Mr. Langan had no criminal involvement prior to this plea. But for these charges, Mr. Langan has been a law-abiding citizen for his entire life. Undergoing this investigation and criminal proceedings have taken a significant toll, both emotionally and physically, upon Mr. Langan, as well as his family. Incarceration will not provide any more deterrence for Mr. Langan than this prosecution has already provided.

It should be noted that Mr. Langan and his company were the first of the defendants to accept responsibility by entering a guilty plea, which assisted the government's ability to successfully prosecute the other defendants.

The company plea, coupled with him individually, has resulted in serious effects. A longtime bank discontinued servicing the business. A present line of credit to operate is now exhausted. Bids are often refused upon arrival. His company is restricted in bidding certain public projects due to the felony plea. Langan lost at least one valuable employee to competition as a direct result of the prosecution. Langan has been forced to bring legal actions against clients to force payment. His work remains stellar and respected, yet his scarlet letter controls. Mr. Langan does the majority of bidding himself, which is the crucial and necessary

service for the future of the company. The results have been devastating, virtually assuring no future illegal activity. The arrest and prosecution of Mr. Langan serves as a directive to others to avoid similar conduct. A period of incarceration appears superfluous.

Of special note, it is uncontested that all projects performed by Langan Insulation, LLC were performed timely, to spec and to the satisfaction of the owner. Langan remains proud of its work product and commitment to exceptional work.

The comments to the sentencing guidelines note that offenders with zero criminal history points and no prior contact with the criminal justice system have the lowest recidivism rate, citing Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* at 6-9 (2017). Mr. Langan fits within this category. According to that study, offenders with no prior criminal justice system contact have only a 25% recidivism rate. Mr. Langan's cooperation with the investigation and remorse shows he is almost certain to be in the 75% who do not get re-arrested. At hi sage and station in life, future illegal activity is highly improbable.

Several character letters have been provided on behalf of Mr. Langan. These letters shall be submitted directly to the court (and the Government simultaneously) but not made part of the public record to promote privacy for the individuals involved. The letters all reflect the unique perception of Mr. Langan and family, personal and business life. A review shows that

on balance, even when the current charges are considered, Mr, Langan has a positive force in society, and it is appropriate that his lifelong contributions be considered in determining a just sentence.

### 5) Incarceration is NOT Needed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment of the Offense.

Mr. Langan has acknowledged that he made mistakes that have led to his arrest, prosecution and ultimate sentence. There are several facts about the Defendant's participation that should be noted that differentiate him from his codefendants and show he has accepted the criminal justice process. The first is that his LLC is entered into a plea first before any other company involved in the alleged conspiracy. As Mr. Langan accepted responsibility for the LLC, this demonstrates his desire to make amends and cooperate with the process.

Mr. Langan only participated with Gary DeVoe for a portion of the time involved. He had a personal relationship with DeVoe, and did not trust others, such as Michael Flynn or Paul Camara, and therefore would not participate with them. This limited the Defendant's participation. Additionally, Mr. Langan would only bid on certain counties within Connecticut, further limiting his participation. Overall the activities of the codefendants took place over several states, and Mr. Langan was uninvolved with those aspects. While not factored by the Government, Mr. Langan received job assignments directly from at least 2 mechanical

contractors due to his reputation and past relationship, contrary to the collusion.

On some jobs Mr. Langan did not make a profit and his bids were actually consistent with what he would ultimately would have bid anyway. Whatever communications may have occurred prior to the bid being entered on those jobs, they did not have an impact on the actual bid and Mr. Langan was not entering a specific bid amount based on an agreement to do so.

**6)** **Incarceration is NOT Necessary to Protect the Public from Future Crimes of the Defendant**

Section 3553(a)(2)(C) also refers to the need for the sentence imposed to "protect the public from further crimes of the defendant." In this instance, although Mr. Langan's actions certainly affected the public, he was never a danger to the public. His offenses did not involve violence, nor did they create a risk of harm to any individual. His insulation work was beyond reproach; never defective or substandard. He was performing anything harmful to the general public, that could endanger a third party. His willingness to accept responsibility and his awareness of the nature of his activity evidence a desire to avoid future problems.

There is no realistic likelihood that Mr. Langan will engage in future criminal activity. Throughout these proceedings, Mr. Langan has expended a great amount of energy processing his wrongful behavior and accepting responsibility for his involvement. It is extremely unlikely that Mr. Langan will engage in future criminal activity and thus the interest in protecting the public from such conduct is non-existent. For these reasons, the Defendant

submits that incarceration, for the purposes of protecting the public from further crimes is unnecessary.

**7) Incarceration is NOT Necessary to Provide Mr. Langan with Education or Vocational Training, Medical Care, or Other Correctional Treatment.**

The record reflects a hard-working, productive member of society. There is no specific education or vocational training that would benefit Mr. Langan. He is able to provide his own medical care.

**8) Restitution is Being Paid to The Victims of the Offense**

Mr. Langan has fully cooperated with the government regarding restitution, including making his financial records freely available so the government was able to know his financial position. The Defendant and his company, Langan Insulation, have paid essentially $160,000 jointly and severally, despite the small size of his business and ongoing operations and economic difficulties. Restitution appears to be satisfied in full. Mr. Langan is essentially Langan Insulation, LLC and Langan Insulation, LLC does not have the financial wherewithal that the other defendants have, yet Mr. Langan has made significant sacrifice through his payments.

**9) A Downward Departure is Appropriate to Give Effect to The Plea Agreement**

Courts are allowed to make a downward departure from the sentencing guidelines to

give effect to a plea agreement. *U.S. v. Fernandez*, 877 F.2d 1138, 1145 (2d Cir. 1989). For the reasons set for the above, Mr. Langan requests a non-guideline sentence with probation or home confinement. This will allow him to continue to work remotely on his business and transition the business into the future. It would appear that his active participation in the investigation, combined with his assistance, was instrumental in understanding the actual impact of the collusion. Other defendants will receive a 5.K.1 letter with acknowledgement of their participation. Mr. Langan should receive at least the same consideration yet will not for inexplicable reasons.

### 10) <u>A Departure from the Guidelines Encompassing Home Detention is Appropriate in this Case</u>

In *Gall v. United States*, 552 U.S. 38, 58 (2007) the Supreme Court approved of a District Court's departure from the guidelines and imposition of probation on a defendant who had conspired to distribute 10,000 ecstasy pills, and for whom the guidelines suggested 30 to 37 months of imprisonment, based on the individual facts of the case. The Court pointed out, "the Guidelines are not mandatory, and thus the 'range of choice dictated by the facts of the case' is significantly broadened. Moreover, the Guidelines are only one of the factors to consider when imposing sentence, and § 3553(a)(3) directs the judge to consider sentences other than imprisonment." *Id.*

This memorandum has pointed out factors which set this case apart and justify the Court

fashioning a sentence that varies from the guidelines.  Mr. Langan has a statistically low

probability of future offenses simply because of his criminal history category, which is even

lower when his individual characteristics are considered.  He is not and never has been a danger

to public safety.  The delay in sentencing, while emotionally and psychologically exhausting to

Mr. Langan, shows his commitment to living a focused and law-abiding life.  Each of the goals

of sentencing would be adequately served through home detention and incarceration would be

counter-productive to Mr. Langan, his family, and society in general.

### 11) <u>The Present Covid-19 Pandemic Makes a Sentence of Home Confinement Appropriate</u>

During the present Covid-19 pandemic, these issues are particularly relevant.  Courts

have long recognized overcrowding in correctional facilities creates health risks and challenges,

even before Covid-19.  See generally *Brown v. Plata*, 563 U.S. 493, 519 (2011) (discussing

overcrowding in California State Prisons).  The Center for Disease Control recognizes the

unique challenge of controlling Covid-19 in a correctional setting.

(https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-

correctional-detention.html, last visited Sept. 2, 2022)  One decision recognized on May 18,

2020, the top three Covid-19 clusters, and 10 of the top 15, were connected to prisons and jails,

and when that mass testing in a correctional facility is done, it shows a high number of

asymptomatic cases.  *United States v. El-Hanafi*, Docket No. 10-CR-162 (KMW), 2020 U.S.

Dist. LEXIS 87888, at *9 (S.D.N.Y. May 19, 2020). Attorney General Barr issued a memorandum as far back as 2020 instructing the Bureau of Prisons to maximize the use of home confinement for inmates at risk where appropriate. (https://www.ussc.gov/about/ news/press-releases/march-10-2022. Last visited Sept. 3, 2022).

Judge Shea recognized the extraordinary circumstances presented by the ongoing pandemic when he ordered the warden at FCI Danbury to process requests for compassionate release more quickly and to focus on the critical issues of inmate and public safety. *Martinez-Brooks v. Easter*, Docket No. 3:20-cv-00569 (MPS), 2020 U.S. Dist. LEXIS 83300, at *82 (D. Conn. May 12, 2020). That case also recognizes that that social distancing is not possible in a prison setting. It is not surprising that Courts have granted many petitions for compassionate release (https://www.ussc.gov/about/news/press-releases/march-10-2022, last visited Sept. 3, 2022), demonstrating that the current pandemic, which keeps spawning new variants of the virus, is not over and is an appropriate factor to consider in what an just sentence is.

Being 73 and having high blood pressure and other medical conditions puts Mr. Langan at higher risk. (https://www.cdc.gov/aging/covid19/covid19-older-adults.html , last visited Sept. 2. 2022). Other Courts have felt that the additional risks posed by Covid-19 is so well established that they have taken judicial notice. See *Ferreyra v. Decker*, 2020 U.S. Dist. LEXIS 90462, at *14 (S.D.N.Y. May 22, 2020). It is common sense, not legal argument, that

tells us placing Mr. Langan in an environment where he cannot social-distance and self-isolate is an entirely different sentence than for a healthy 30-year-old. The Court's responsibility in individualized justice mandates a sentence that is very different today than it might have been three years ago. Under the present situation it is entirely appropriate for the Court to confine Mr. Langan, an older, first-time, non-violent offender with increased health risks to home confinement rather than incarceration.

**IX.    CONCLUSION:**

"Both 'before and since the American colonies became a nation,' British and American courts have recognized that sentencing judges should not be confined 'to the narrow issue of guilt' in determining punishment but should consider 'the fullest information concerning the defendant's life and characteristics.'" *United States v. Broxmeyer*, supra at 135, citing *Williams v. New York*, 337 U.S. 241, 246–47 (1949). Sentences must be appropriate to the facts of the offender and the crime. Mr. Langan's situation and participation is not run of the mill.

Mr. Langan respectfully submits that, based on the foregoing, a sentence substantially outside the guideline range, including home detention, supervised release or probation rather than incarceration, would be appropriate and allow him to continue to support his loved ones. His likelihood to commit a violation of the law in the future is assuredly unlikely. The

requested reduced sentence would clearly be within the factors set out by 18 U.S.C. 3553(a) to

achieve a just and individualized sentence.

RESPECTFULLY SUBMITTED,
DEFENDANT, THOMAS F. LANGAN

By:     /s/  Raymond M. Hassett, Esq.
        Raymond M. Hassett, Esq. (CT 02175)
        Hassett & George, P.C.
        945 Hopmeadow Street
        Simsbury, CT 06070
        Phone: (860) 651-1333
        rhassett@hgesq.com

## CERTIFICATION

I hereby certify that on the date first above a copy of the foregoing was filed electronically and served by mail to anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.


By:     /s/ Raymond M. Hassett
        Raymond M. Hassett


*S:\Cr\Langan, Tom 2018\sentencing\thomas langan.Defendant's Memorandum in Aid of Sentencing 9.14.22 Final RMH.doc*