UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:20CR14 (KAD) |
| | : | |
| v. | : | |
| | : | |
| THOMAS F. LANGAN | : | September 21, 2022 |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

The government respectfully submits this memorandum to aid the Court in connection with the upcoming sentencing of defendant Thomas F. Langan ("Langan"), scheduled for September 28, 2022, at 10:00 am. On February 3, 2020, Langan waived indictment and pled guilty to a two-count Information charging him with participating in a bid rigging conspiracy in violation of 15 U.S.C. §1 and in a fraud conspiracy in violation of 18 U.S.C. §1349. Docket Nos. 1 & 5. The parties subsequently entered into a plea agreement supplement on August 25, 2022, which includes stipulations on the fraud loss and restitution. Docket No. 84.

Langan engaged in multi-year conspiracies to rig bids and engage in fraud on insulation contracts in a scheme designed to protect and enrich their bottom line. His criminal conduct impacted local hospitals, schools, universities, and private facilities, causing them to pay more for insulation sub-contracts on dozens of construction projects in Connecticut. Exhibit 1 lists the affected projects and corresponding overcharge.

For the reasons stated herein, the government respectfully recommends that the Court sentence the defendant to a significant sentence of imprisonment and order him to pay mandatory restitution of $480,900, jointly and severally with the defendant's principal, Langan Insulation,

and a fine in the range of $20,000 to $150,000. Exhibit 2 lists the proposed victims and restitution amounts identified by the government.

## I. THE OFFENSE CONDUCT

The Presentence Report dated June 3, 2020, as updated by the Second Addendum to the Presentence Report, dated February 23, 2022, and the Third Addendum to the Presentence Report, dated September 2, 2022, accurately outlines Langan's offense conduct, and the government does not take issue with the facts described therein. *See* PSR ¶¶ 8-33. Therefore, for the purposes of its sentencing memorandum, the government will focus on the conduct's impact on victims.

## II. VICTIM IMPACT

The victims were project owners who sought insulated heating ducts, air conditioning ducts, and plumbing pipes on their newly constructed or renovated buildings, specifically, local hospitals, municipalities, universities, and private businesses. The project owners relied on various contractors to build or renovate hospital wings, academic classrooms, research labs, and high schools. Generally, the insulation contractors put in bids to mechanical contractors, who are responsible for installing the ducts and plumbing, and the mechanicals, in turn, bid to construction managers who oversee the construction and completion of the overall project on behalf of the owners.

The competitive bidding process is the means for minimizing costs associated with these projects and ultimately obtaining the best value for the project. The mechanical contractors rely on the bids provided by the insulation contractors to provide a competitive price for the insulation component of each particular project. To ensure such bid amounts are fair and competitive, the mechanical contractors expect a confidential and independent bidding process.

2

Contrary to Mr. Langan's assertions, the existence of non-conspiratorial competitors did not ensure a competitive bid process. Def. Memo. at 13. Rather, the conspiracy worked as long as it did precisely because the conspirators faced little or no competition on the affected projects.

Additionally, the mechanical contractors cannot independently calculate the insulation contractors' prices. Even in the instances where an upcoming project is similar to a recently completed project, the mechanical contractors would only have a "ballpark idea" of what the insulation contractors' prices may be, and in all of the other instances, the mechanical contractors have no basis to estimate the insulation contractors' prices, let alone "a reasonable estimate of the costs of the insulators job," as stated by Mr. Langan. Def. Memo. at 6.

Collusion by the insulators has an impact on prices paid by project owners, despite being third-tier subcontractors on the projects. An overcharge by the insulators is incorporated into the mechanical contractors' bids to the construction manager. Construction mangers pass on the costs of the higher mechanical contract prices to the project owners, who ultimately suffer the loss from the collusion.

Several victims have written about the harm they have suffered as a result of Langan's and his co-conspirators' schemes. The City of Meriden, one of the project owner victims, provided the following:

> Meriden is a very diverse city of approximately 60,000 residents and is one of the poorest municipalities in Connecticut. Meriden's per capita income is $33,452, and it is ranked 148th out of the 169 Connecticut municipalities for PCI. Accordingly, competitive bidding is especially imperative to the economically-challenged City and its taxpayers, residents and businesses alike.
>
> The City's Purchasing Department handles the procurement of all commodities through a comprehensive request for proposal process. On April 7, 2013, Superior Mechanical System, Inc. of Wallingford, Connecticut submitted its bid for a plumbing work to be performed at the Francis T. Maloney High School. The lump sum bid was in the amount $3,820,790, and the bid denotes that "Langan" would be a trade subcontractor for the

3

> insulation work. The bid also denotes that the total cost of the insulation portion of the work was in the amount of $410,000.
>
> It was very disturbing to learn of the defendants' violation of antitrust laws, conspiracy, and criminal behavior surrounding their insulation contracts. These transgressions and economic crimes not only violate the integrity of the City's procurement process but, ultimately, violate one of the most vulnerable populations in Connecticut. …
>
> Respectfully, the City requests that the defendants be held accountable for their egregious actions perpetuated on the taxpayers of Meriden.

City of Meriden Victim Impact Statement dated June 10, 2020. Exhibit 3 at 1.

Yale University, another project owner victim, wrote to highlight the importance of enforcing antitrust laws and the impact on the university, its students, and faculty:

> The mission of Yale University is two-fold: First, Yale educates over 13,000 students in Yale College, the Graduate School of Arts & Sciences, and 12 professional schools. The majority of these students receive financial aid, and many of them pay no tuition at all. Second, Yale conducts world-class research in every area of the natural sciences, social sciences, and humanities. The importance of Yale's research is reflected in the fact that its current faculty includes four Nobel laureates. In addition, with over 10,000 employees, Yale is the largest employer in the New Haven area.
>
> As stewards of an educational and research institution, the Yale administration makes every effort to protect the funds that the university receives from donors, granting agencies, and students because every dollar wasted is a dollar taken from financial aid, medical research, free public art galleries, and many other worthy uses. Unfortunately, Yale's best efforts are not always sufficient. When contractors collude in secret to enrich themselves at their customers' expense, carefully conceived bidding processes and contracts cannot protect us, and the resulting inflated prices can be difficult to detect. For this reason, when the federal authorities identify fraudulent behavior that distorts markets and cheats customers, it is important for the courts to impose sentences that send a clear message.
>
> Finally, I want to emphasize that this is not a victimless crime. Yale's funds are dedicated to education and research, and when those funds are illicitly siphoned off, Yale's students, researchers, and employees are harmed. To restore those funds for their intended use, Yale requests that the Court order the restitution requested by the United States.

Yale University Victim Impact Statement dated June 10 2020. Exhibit 3 at 3.

University of Connecticut, a project owner victim, wrote:

> As a public flagship university, UConn is dedicated to providing the highest quality education to students with a wide range of backgrounds and interests, with its campus facilities being critical to that work.
>
> UConn and the State of Connecticut work diligently to ensure that construction of those academic spaces, research labs, student service centers, medical buildings, and other projects meet stringent standards as a way to honor our fiduciary responsibility to the state's residents.
>
> It is incredibly disappointing to learn that the competitive bidding process, which is a bulwark of that process, was circumvented in a manner that the U.S. Department of Justice estimates inflated prices by 10[1] percent in certain campus projects.
>
> While we are always cognizant of the need for fiscal caution and responsibility, this has been particularly true in recent years as resources have become increasingly constrained. UConn takes very seriously its responsibility as a steward of public funds, and expects the same from those with whom it does business.
>
> The damage from this breach of trust is not only financial. Fraud of this type also has the potential to negate our ability to ensure that honest, conscientious companies can compete on the level playing field they expect and deserve when participating in the public bidding process.

University of Connecticut Victim Impact Statement dated June 10, 2020. Exhibit 3 at 4.

The Town of Stratford, another project owner victim, wrote the following with respect to this case:

> … Without [the instant investigation] the collusion which marked the Stratford High School renovation project would, undoubtedly, never have come to light to the detriment to the taxpayers who pay for this project through their payment of taxes both on the State and local levels.
>
> Competitive bidding requirements for public construction projects are obviously meant to insure that the public obtains the best possible pricing for large scale projects of this nature. They also assist in bringing the opportunity to perform work on such projects within the spectrum of a wide range of contractors and sub-contractors, thereby promoting a fairness in awarding public contracts. However, when certain potential bidders refuse to play by the rules it prevents the goals of the competitive bidding requirement from being realized. The defendants here knew the rules when they decided to bid on the project, but apparently

---

[1] The government subsequently revised its assessment of the bid inflation rate to 5%. *See infra* III.C.1.

were not satisfied with the monies they would have earned had they had to make a truly independent bid. As a result, rather than simply declining to bid on the project, they took affirmative steps to guarantee that their ultimate financial goal would be realized, again to the economic detriment of the citizens and taxpayers of Stratford who pay for them to accomplish that financial goal.

In today's world the taxpayers share a heavy tax load, supporting as they do governments on the federal, state and local levels. The Department of Justice has calculated that as a result of the actions of the defendants the taxpayers of Stratford were caused to pay \$51,000[2] more for this project than they should have. While the sum, when prorated across the board, does not result in a significant tax increase to each individual Stratford taxpayer, it nevertheless is an increase that should not have been incurred. Furthermore the defendants actions usurped \$51,000 for this project that could have been allocated to other worthy projects within Stratford. Finally, when combined with other projects where such collusion may possibly occur, the cost to the taxpayer in the aggregate becomes staggering.

The Stratford High School project has produced a wonderful modern learning facility that, hopefully, will provide for the educational needs of Stratford students for years to come. Additionally, the quality of the work has been performed largely in a more than adequate manner. However, we must separate the quality of the work performed from the underlying corruption tainting the manner in which the contracts for the work were awarded. As such, some form of punishment commensurate with the actions involved should be meted out by the Court, both as a sanction to the defendants involved here and as a message to others who would attempt to disobey the law in the future. We leave that to the Court's sound discretion. However, the citizens of Stratford have been caused to pay \$51,000 more than they should have and we heartily endorse the Government's position that any resolution of this matter should order those funds to be reimbursed to Stratford.

Town of Stratford Victim Impact Statement dated June 25, 2020. Exhibit 3 at 6.

The government recommends that the restitution from the conspiracy be apportioned by which co-conspirator won the insulation contract causing the loss to the victim, pursuant to 18 U.S.C. § 3664(h). Therefore, the government recommends that Langan pay \$480,900 in restitution, on a joint and several basis with Langan Insulation, which is calculated by applying

---

[2] The \$51,000 relates to two contracts at Stratford High School won by Langan and a coconspirator. The government's apportioned restitution recommendation for defendants Langan and Langan Insulation reflects only the overcharge on the contract won by Langan Insulation. The overcharge on the other contract will be accounted for in the government's restitution recommendation for that coconspirator.

6

the bid inflation rate of 5% on the nine affected projects won by Langan Insulation, as set forth in Exhibits 1 and 2.

### III. GUIDELINES

#### A. Applicable Law

The Guidelines continue to provide guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Although Booker held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district Courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *See also* id. at 50 n.6 ("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.").

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)–(7); *See also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

### B. The Presentence Report Correctly Calculates the Guidelines Range

The government has no objections to the Probation Office's revised determination that the total offense level is 20, which results in a Guidelines sentence of 33 to 41 months of imprisonment and a fine of $15,000 to $150,000. PSR ¶¶ 42-54, 95-98; Third Addendum to the Presentence Report, dated September 2, 2022 at ¶¶ 16, 23, 33-34.

The parties have stipulated to the fraud loss and the Probation Office adopted the parties stipulated loss amount of $1,471,790, which results in a 14-level increase under U.S.S.G. § 2B1.1(b)(1)(H) because the reasonably foreseeable loss is between $550,000 and $1,500,000. The Probation Office then applied a two-level increase under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved ten or more victims. This results in a base offense level of 23. With an anticipated reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, the total resulting offense level is 20, which results in a range of 33 to 41 months of imprisonment.

The government notes that in its submissions to probation it had originally sought a 2-level increase under U.S.S.G. § 2B1.1(b)(10)(C) because the conduct involved sophisticated means. The government is no longer requesting the sophisticated means enhancement for Langan but reserves the right to seek this enhancement for the other defendants.

### C. Langan's Offense Level Should be Increased by 14 Levels Because the Reasonably Foreseeable Losses Resulting from His and His Co-Conspirators' Conduct is at Least $1,471,790

As set forth in the Third Addendum to the Presentence Report and stipulated by the parties, the reasonably foreseeable losses stemming from the defendant's conduct is $1,471,790.

8

PSR ¶ 23; Docket No. 84. Calculation of the reasonably foreseeable losses is based on a straight-forward application of the stipulated 5% bid inflation rate to the total value of the contracts for 26 projects that were rigged as part of the charged conspiracies. PSR ¶ 16.

### 1. Bid Inflation Rate

The parties had previously entered into stipulated plea agreements stating Langan, Langan Insulation, and their co-conspirators had "inflated their bid prices by approximately 10% as a result of their agreement to rig bids and engage in fraud." (Thomas F. Langan Plea Agreement, Stipulation of Offense and Relevant Conduct, ¶10). Additionally, four co-defendants, including Langan Insulation, stipulated that their bid prices were inflated "at least 10%."

Subsequently, witnesses have explained that their best estimate at this time is that their bids were inflated approximately 5-6% or 5-7% as a result of the bid rigging. In light of those statements, the parties have agreed to modify the bid inflation rate used for calculating the fraud loss and restitution to 5%. As set forth in U.S.S.G. §2B Application Note 3 (C) ("Estimation of Loss"), the Court need only make a reasonable estimate of the loss, considering, as appropriate and practicable under the circumstances, a range factors including the approximate number of victims multiplied by the average loss to each victim.

### 2. The Total Value of the 26 Rigged Projects was $29,435,800

As found by Probation and stipulated by the parties, Langan and his co-conspirators rigged bids on $29,435,800 worth of insulation projects. PSR ¶ 23; Docket No. 84. A summary of the evidence underlying each rigged project was provided to Probation. The government calculated a total value for the 26 rigged insulation projects by aggregating the contract amount for each rigged project. *See* Exhibit 1.

9

### 3. The Reasonably Foreseeable Losses Total is $1,471,790

As found by Probation and stipulated by the parties, the total resulting fraud loss is $1,471,790 (5% of $29,435,800). PSR ¶ 23; Docket No. 84; *See* Exhibit 1. As a result, a 14-level increase is warranted to account for the reasonably foreseeable losses resulting from the charged conduct.

### D. Langan's Offense Level Should be Increased by Two Levels Because the Offense Involved Ten or More Victims

As found by Probation, a two-level enhancement is warranted because the offense involved ten or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i). PSR ¶ 35.

### E. Langan's Offense Level Should be Decreased by Three Levels Because of his Acceptance of Responsibility

As found by Probation and stipulated by the parties, a three-level decrease is warranted because of Langan's prompt recognition and affirmative acceptance of personal responsibility, and prompt notification of his intention to enter a plea of guilty, pursuant to U.S.S.G. § 3E1.1. PSR ¶¶ 52-53.

Accordingly, the government submits that a total offense level of 20 is the correct calculation of the Guidelines.

## IV. THE 3553(A) FACTORS WEIGH HEAVILY IN FAVOR OF A SIGNIFICANT PRISON SENTENCE

The government's recommendation of a significant sentence of imprisonment is reasonable and not greater than necessary in light of the factors articulated in 18 U.S.C. § 3553. The most compelling factors weighing in favor of a sentence of imprisonment are the need for the sentence to reflect the seriousness of the offense, the history and characteristics of the

defendant, promote respect for the law, achieve general and specific deterrence and avoid unwarranted sentencing disparities.

First, a significant sentence of imprisonment answers the need for the punishment to fit the "seriousness of defendant's offense." 18 U.S.C. § 3553(a)(2)(A). An antitrust conspiracy is, by its very nature, a serious offense. As the Guidelines explain, "there is near universal agreement that restrictive agreements among competitors, such as horizontal price-fixing (including bid-rigging) . . . can cause serious economic harm." U.S.S.G. § 2R1.1, cmt. Background. This is why "[a]bsent adjustments, the guidelines require some period of confinement in the great majority of cases that are prosecuted, including all bid-rigging cases." *Id.;* cmt. n.5 ("It is the intent of the Commission that alternatives such as community confinement not be used to avoid imprisonment of antitrust offenders."); *See also United States v. Rattoballi,* 452 F.3d 127, 136 (2d Cir. 2006), *abrogated in part on other grounds by Kimbrough v. United States,* 552 U.S. 85 (2007) ("the policy statements make plain that imprisonment is generally warranted for antitrust offenders"). The seriousness of this offense therefore strongly supports a significant sentence of imprisonment.

Second, a significant sentence of imprisonment is also supported by "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Langan's conduct was motivated by greed. Langan has an 49% ownership interest in Langan Insulation, with the remainder owned by his niece, and has maintained control of all aspects of the bidding process since its formation. Langan built a profitable business, with between $4 and $6 million in annual revenue, through his active participation in the conspiracies. Instead of submitting competitive bids, he was able to work with his competitors to split up the market and to determine prices that suited their needs. The schemes guaranteed that Langan Insulation would have a steady stream of contracts,

11

at prices that allowed him to build a multi-million-dollar business. And the schemes allowed Langan to personally profit, at the expense of the project owners.

Third, a significant sentence of imprisonment is critical "to afford adequate deterrence to criminal conduct" by other potential offenders. 18 U.S.C. § 3553(a)(2)(B). Bid-rigging and fraud-based crimes, like the one perpetrated by Langan, are very difficult to detect and prosecute. These crimes consist of secret agreements between individuals who are motivated to conceal their criminal activities. The difficulty in detecting these crimes is highlighted by the fact Langan and his co-conspirators avoided detection for more than seven years. It is further highlighted by the difficulty in calculating an exact loss and restitution amount for the full scope of all of the rigged projects. Individuals like Langan who are involved in these critical procurements must be encouraged to pause and consider the consequences of their anticompetitive conduct, since the impact of their crimes can be so widely felt. The conduct at issue involved every aspect of the critical infrastructure for our communities – including hospitals, schools, and universities. Each of those facilities paid more for the insulation installation than they should have – and as a result, less of those critically needed funds were available for other uses. When offenders like Langan are caught, the punishment must be substantial enough to far outweigh the expected criminal rewards, especially when the risk of detection and conviction is low, as is often the case with such secretive schemes. Further, while Mr. Langan did help bring about the first *company* plea in this investigation, he was the fourth conspirator to enter a plea in this investigation. *See* Thomas F. Langan Sentencing Memorandum at 24. While his acceptance of responsibility warrants a sentencing guidelines reduction, it does not warrant a departure or variance because his acceptance of responsibility was *after* his conduct was uncovered and his co-conspirators had already admitted their roles.

Fourth, the imposition of a significant sentence of imprisonment best serves "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In creating the Guidelines, "Congress sought uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct." *Rita*, 551 U.S. at 349 (internal quotation marks omitted). Even after *Booker*, "uniformity remains an important goal of sentencing." *Kimbrough*, 552 U.S. at 107. The Guidelines "help to avoid excessive sentencing disparities," *Id*. (internal quotation marks omitted), because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," *Gall*, 552 U.S. at 54, and because most defendants are sentenced within the Guideline ranges, *See Peugh*, 133 S. Ct. at 2084.

Therefore, the government respectfully requests that the Court impose a significant sentence of imprisonment.

### V. LANGAN'S SENTENCE SHOULD INCLUDE A FINE

The government submits that a fine in the advisory Guidelines range of $20,000 to $150,000 is appropriate in this case. $20,000 is the minimum Guidelines fine for an antitrust offense pursuant to U.S.S.G. § 2R1.1(c)(1).

### VI. RESTITUTION

Pursuant to 18 U.S.C § 3663A, restitution is mandatory for losses resulting from the defendant's schemes. As set forth in detail in the Presentence Report and its Addendums, the government submits that there is sufficient evidence, by the requisite preponderance of the evidence, proving that Langan and his co-conspirators caused actual losses totaling at least $1,471,790 to project owners. *See* Exhibit 1. The project owners, which include hospitals,

13

universities, local schools, and private institutions, have incurred substantial losses as a result of the defendant's schemes and should be restored to their state before the crimes occurred.

The parties agree to recommend to the Court that the Court apportion restitution based upon which co-conspirator won the insulation contract project and pursuant to the procedures set forth in 18 U.S.C. § 3664(h), to reflect the level of the defendant's contribution to the victims' losses. Langan agrees to pay $480,900 in restitution, on a joint and several basis with the defendant's principal, Langan Insulation, in the amounts and to the victims identified in the Exhibit 2.

Furthermore, regardless of the restitution that may be ordered by the Court, the government and the defendant agree to recommend that the defendant pay restitution in installments pursuant to 18 U.S.C. § 3664(f)(3)(A). Specifically, the parties recommend that the full amount, less any contributions by the defendant's principal, Langan Insulation, will be due at the eighteen-month anniversary of the date of imposition of the sentence. The parties recommend the payment of restitution in installments to allow the government time to pursue the Department of Justice Money Laundering and Asset Recovery Section's ("MLARS") restoration process contemplated in the parties' plea agreement supplement. Docket No. 84. A restoration application constitutes a request for Departmental authority to apply the proceeds of a designated forfeiture to victim restitution. The decision whether to grant the application lies exclusively with the MLARS.

## VII. CONCLUSION

For the foregoing reasons, in light of the nature and severity of Langan's crimes, his history and characteristics, the applicable Guideline sentence and policy statements promulgated by the Sentencing Commission, and the need to promote deterrence, the government respectfully

submits that a significant sentence of imprisonment and a fine of $20,000 to $150,000 is appropriate in this case.  In addition, the government and the defendant request that the Court apportion restitution, pursuant to the procedures set forth in 18 U.S.C. § 3664(h), and order Langan to pay $480,900 in restitution, on a joint and several basis with the defendant's principal, Langan Insulation, in the amounts and to the victims identified in Exhibit 2.

                                      Respectfully submitted,

                                      _____/s/_____
                                      Eyitayo St. Matthew-Daniel
                                      Assistant Chief, New York Office
                                      U.S. Department of Justice
                                      Antitrust Division


                                      _____/s/_____
                                      Milosz Gudzowski
                                      Phil Andriole
                                      Trial Attorneys
                                      Department of Justice
                                      Antitrust Division


                                      _____/s/_____
                                      David E. Novick
                                      Assistant United States Attorney
                                      District of Connecticut

## CERTIFICATE OF SERVICE

       I hereby certify that on September 21, 2022 a copy of the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                          /s/
                                 MILOSZ GUDZOWSKI
                                 TRIAL ATTORNEY